<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MICHAEL ALFORD | : |
|  | : Civil Action No. 03-795 (FLW) |
| Plaintiff | : |
|  | : |
| v. | : **OPINION** |
|  | : |
| DAVID OWEN, et al. | : |
|  | : |
| Defendant | : |

**WOLFSON, United States District Judge**

This matter comes before the Court on Defendant David Owen's Motion for Summary Judgment pursuant to <u>Fed. R. Civ. P.</u> 56. Plaintiff Michael Alford alleges violations of his Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 for inadequate medical care at Camden County Correctional Facility ("CCCF") and Defendants' failure to protect him from other inmates. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons discussed herein, the Court grants Defendant's Motion in its entirety, and will grant summary judgment *sua sponte* to Officers Joe Doe (1-10).[1]

---

[1] The Court notes that the Office of County Counsel has not officially entered an appearance on behalf of the individual Officer Defendants, and this Motion is not formally made on their behalf. However, County Counsel's brief sets forth arguments on behalf of the Officers, which have been responded to by Plaintiff. The Court thus finds that granting summary judgment to the individual Officers *sua sponte* is appropriate in this instance. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986); <u>Gibson v. Mayor and Council of the City of Wilmington</u>, 355 F.3d 215, 224 (3d Cir. 2004) (presence of a fully developed record, the lack of prejudice, and a decision based on a purely legal issue all provide basis for grant of summary judgment *sua sponte*).

I.      BACKGROUND

Plaintiff was a pretrial detainee at the Camden County Correctional Facility ("CCCF") in Camden, N.J., on April 21, 2001, the date of the incident that is the subject of Plaintiff's Complaint. Deposition of Michael Alford, Exhibit 4 to Defendants' Motion for Summary Judgment ("Def. Exh.") at 6:16-24. Plaintiff shared a cell in the 5 South "E" block with two other inmates, Roger Thornton and Miguel Figueroa. Certification of Sergeant Kenneth Cunningham, Def. Exh. 5, at ¶ 4. The cell contained a bunk bed, which was occupied by Thornton and Figueroa; Plaintiff slept on a mattress on the floor. Id. at 19:3-13. At the time of the incident, Plaintiff had lived in this cell for approximately a month. Id. at 18:4-16. Plaintiff got along well with Thornton and Figueroa, and was teaching Thornton how to read. Id. at 19:23-20:5; 21:1-18.

On the morning of April 2, 2001, Thornton awoke early to watch television in the day room adjacent to the cell. Id. at 21:21-22:6. Plaintiff claims that Thornton often woke up early, but that he and Figueroa slept until around lunch time. Id. at 22:1-2. Plaintiff alleges that on that morning he was having trouble sleeping because of the noise of the television. Id. at 22:6-12. Plaintiff claims that he asked Thornton to turn the volume on the television down, but that Thornton became very defensive and refused to lower the volume. Id. at 22:9-23:17. Plaintiff tried to fall back asleep, but a few minutes later got up from bed, went into the day room, lowered the volume, and returned to bed. Id. at 23:19-22. A few minutes later Thornton raised the volume again and then argued with Plaintiff about the television. Id. at 23:22-24. At no time during these events did Plaintiff attempt to complain to any of the prison guards or staff. Id. at

88:2-14; 90:2-24.

Once the volume was turned up, Plaintiff decided to get up because he was unable to sleep. Id. at 25:17-19. Plaintiff washed up, got dressed, and then sat down in a chair in the day room to watch television with Thornton. Id. at 23:19-25; 24:1-16; 25:19-26:8. Plaintiff alleges that Thornton then left the day room and went back into the cell, without speaking to Plaintiff. Id. at 27:16-19. A few minutes after Thornton left, Plaintiff lowered the volume on the television and continued to watch it. Id.

Thornton returned to the room where Plaintiff was watching television, walked directly up to him, and began punching Plaintiff repeatedly. Id. at 28:1-30:23. Plaintiff wrapped his arms around Thornton and pushed him into the wall under the television. Id. at 31:1-20. With his head in Thornton's chest, still fighting, Plaintiff heard a gritting sound and felt Thornton bite down on his ear. Id. at 31:21-34:21.

Plaintiff cried out in pain, causing the other inmates to watch what was happening. Id. at 38:15-25. Inmates banged on the doors to get a correctional officer to come break up the fight. Id. at 39:5-9. Approximately two to three minutes later, Officer Manuel Rolon came to the cell and separated Plaintiff and Thornton. Id. at 39:12-23. As Rolon approached the cell, other inmates told Plaintiff that Thornton had bitten his ear off. Id. at 40:17-41:3. Plaintiff felt his ear, saw he was bleeding, and discovered that Thornton had bitten part of his ear off. Id. at 41:4-6; 41:24-42:2.

Plaintiff began looking down to search for the piece of his ear that was missing. Id. at 41:7-11. Officer Rolon grabbed Plaintiff by the arm and told him that he needed to be taken to medical department. Id. at 42:18-43:3. Plaintiff pushed away from Rolon, saying that he needed

3

to search for his ear. Id. at 43:15-18. Rolon grabbed Plaintiff again, this time not letting him go, and insisted that Plaintiff go to the medical department. Id. at 44:14-45:1. After continuing to look down for his ear for a minute or two, Plaintiff went with Officer Rolon to the medical department. Id. at 46:1-6.

After being examined by a doctor in the medical department, Plaintiff was taken to Our Lady of Lourdes Hospital in Camden. Id. at 51:20-53:2. At the hospital, the remaining part of his ear was stitched up. Id. at 53:7-12. The doctor who treated Plaintiff at the hospital recommended that he see Dr. Scott Busch the next day for his injuries. Id. at 55:21-22; 56:8-12. The officer accompanying Plaintiff informed the doctor that there is a required procedure to be followed before making an appointment. Id. at 56:13-15. Plaintiff was taken back to CCCF that day and housed in the medical block. Id. at 57:8-14. Plaintiff was given a disciplinary report as a result of the incident. Id. at 57:15-17. He attended a disciplinary hearing a few days later, where he was found guilty of having an "altercation." Id. at 57:20-58:13.

Sergeant Kenneth Cunningham was on duty the day of the incident and was informed by Officer Rolon that he was taking Plaintiff to the medical department. Def. Exh. 5 at ¶ 2. After another sergeant who was on duty told him the details of the incident, Cunningham went to the block where the incident took place and found Figueroa outside his cell searching for the ear. Id. at ¶ 3, ¶ 4. Figueroa told Cunningham that Thornton had "bit off Michael's ear and ate it." Id. at ¶ 5. Cunningham asked Thornton about it and searched his mouth for signs of the ear. Id. at ¶¶ 5-6. He then searched the cell area, the day room, and the area between the security grates and the windows in the day room with Rolon and two investigators from the Internal Affairs department. Id. at ¶ 8-13. None of them found any sign of Plaintiff's ear. Id.

Several days later, Plaintiff was taken to Dr. Busch. Def. Exh. 4 at 64:15-19. Dr. Busch said that cartilage would be taken from Plaintiff's ribs and used to construct a new ear, but that the ear needed to heal for a month before any reconstructive surgery could be done. Id. at 64:21-65:10. Busch told Plaintiff that the reconstruction process would take up to a year. Id. at 65:10-11. Plaintiff went back to Dr. Busch to have the stitches in his ear removed approximately nine or ten days later. Id. at 66:20-67:4. Plaintiff was told by Dr. Busch that the work that would be done depended on how much county insurance would cover. Id. at 67:16-19.

Plaintiff had his first surgery at Cooper Hospital approximately a year after the incident in 2002. Id. at 69:13-14; 69:14-18. A second surgery was performed the same year, and a third surgery was performed around a year after the first. Id. at 71:1-72:10. Following the surgeries, Plaintiff has undergone daily treatments where the ear is flushed with peroxide and saline to prevent infection. Id. at 76:6-18. Plaintiff has had infections in his ear since the surgeries. Id. at 72:25-73:8. Because infected sections of the ear continuously have to be removed, there is a possibility that future surgeries will be required. Id. at 73:9-11.

Prior to his surgeries, Plaintiff had intense pain in his ear, but no problem hearing out of the ear. Id. at 75:8; 81:18-82:4. Following the surgeries, Plaintiff's pain has not been as intense. Id. However, Plaintiff claims that the daily treatment is painful. Id. at 75:21-24. Additionally, he gets occasional, intense headaches that feel like a throbbing in his ear. Id. at 76:24-77:7. He cannot sleep on his side without pain from the ear. Id. at 75:14-18; 78:4-9. Plaintiff also complains of a constant ringing sound from the affected ear. Id. at 74:8-75:8. Plaintiff also claims that he suffered emotional injuries prior to his surgery because of the embarrassment of having only one ear and ridicule from the other inmates. Id. at 82:9-83:14.

## II.     PROCEDURAL HISTORY

Plaintiff filed the instant Complaint on February 24, 2003, naming as Defendants Joe Doe (1-10), Officers at CCCF; and David S. Owen, Jr., Warden of CCCF.[2]  On March 12, 2003, the Court granted Plaintiff's application for *in forma pauperis* status.  Defendants initially filed their Motion for Summary Judgment on July 30, 2004.  On January 19, 2005, the Court denied without Prejudice Defendants' Motion for Summary Judgment because Defendants had failed to provide Plaintiff with documents requested in discovery.  Defendants filed the instant Motion for Summary Judgment on March 30, 2005.

## III.    DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A genuine issue of material fact is one that will

---

[2]Pursuant to N.J. Civ. Prac. R. 4:26-4, Plaintiff filed his complaint substituting the fictitious names of Joe Doe (1-10) for the names of the officers who were on duty the morning of April 21, 2001.  Although Plaintiff has not formally made a Motion to Amend, as required by the Rule, discovery has revealed that the Officers on duty on the morning of the incident were Supervisor Sergeant Cunningham and Corrections Officers Rolon, Kaelin, Crawford, and Maull. See Defendant's Reply Brief Exhibit B at Interrogatory 2.  As such, the Court will substitute these Officers for Joe Does (1-10).

Defendants submit that Plaintiff has also named CCCF itself as a Defendant, and argue that CCCF is an entity that is not capable of being sued.  However, the Court interprets Plaintiff's Complaint as listing CCCF as part of the description of the Joe Doe Defendants and Warden Owens.  Plaintiff asserts claims against "Defendant Joe Doe (1-10) Fictitious Names, Department of Correctional Officer [sic], Camden County Correctional Facility," and "David S. Owen Jr., Department of Correctional Warden, Camden County Correctional Facility."  Because the Court does not find that Plaintiff named CCCF as a Defendant, it need not address this argument.

permit a reasonable jury to return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To show that a genuine issue of material fact exists, the nonmoving party may not rest upon mere allegations, but must present actual evidence in support thereof. Id. at 249 (citing First Nat'l Bank of Arizona v. Cities Svc. Co., 391 U.S. 253, 290 (1968)). In evaluating the evidence, the Court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [nonmoving] party." Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002) (quoting Bartnicki v. Vopper, 200 F.3d 109, 114 (3d Cir. 1999)).

Because Plaintiff is appearing *pro se*, his pleadings are to be construed liberally. Haines v. Kerner, 404 U.S. 519, 520 (1972). However, even though *pro se* pleadings are entitled to liberal construction, the Plaintiff must still set forth facts sufficient to survive summary judgment. Kaiser v. Bailey, 2003 WL 21500339, at *3 (D.N.J. July 1, 2003).

### B.   Fourteenth Amendment Claims[3]

---

[3] Plaintiff fails to specify in his Complaint whether he is suing Warden Owen in his individual or official capacity. Although the Court will liberally construe Plaintiff's Complaint as asserting claims against Owen in both capacities, Plaintiff fails to allege facts to support a claim against Owen in his individual capacity.

> A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.
> Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

Plaintiff does not allege that Owen directed, participated in, or had knowledge and acquiesced in the alleged violations, and will grant summary judgment to Owen in his individual capacity to the extent that Plaintiff intended to assert such a claim.

A § 1983 action brought against a person in his official capacity "generally represent[s] only another way of pleading an action against an entity of which the officer is an agent." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 n.55 (1978). Through his suit against Owen in his official capacity, Plaintiff therefore is asserting a claim against the Camden

The Court liberally construes the allegations in the complaint as two separate violations of his Fourteenth Amendment due process rights pursuant to § 1983: (1) that the Camden County Department of Corrections ("CCDC") exhibited deliberate indifference to his medical needs; and (2) that the CCDC and individual officers failed to protect him from a substantial risk of harm from other inmates.[4]

       1.     Inadequate Medical Care

Pretrial detainees' Fourteenth Amendment claims for inadequate medical care are analyzed under the "deliberate indifference" standard employed in Eighth Amendment cases. See Natale v. Camden County Correctional Facility, 318 F.3d 575, 581-582 (3d Cir. 2003) ("In previous cases, we have found no reason to apply a different standard than that set forth in Estelle.... We therefore evaluate Natale's Fourteenth Amendment claim for inadequate medical care under the standard used to evaluate similar claims under the Eighth Amendment."); Simmons v. City of Philadelphia, 947 F.2d 1042, 1067 (3d Cir. 1991), cert. denied, 503 U.S. 985 (1992); Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d. Cir. 1990); Taylor v. Plousis, 101 F. Supp.2d 255, 262 n.3 (D.N.J. 2000). See also Hubbard, 399 F.3d at 166, n. 22.

The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. Estelle v. Gamble, 429 U.S. 97

---

County Department of Corrections.

    [4] Defendants have briefed Plaintiff's allegations as alleging violations of his Eighth Amendment rights. However, the Eighth Amendment only applies to prisoners after they are convicted. Hubbard v. Taylor, 399 F.3d 150, 164 (3d Cir. 2005). The constitutional claims of pretrial detainees are considered under the Due Process clause of the Fourteenth Amendment. Id. at 158 n. 13. See also City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 243-245 (1983); Fuentes v. Wagner, 206 F.3d 335, 344 (3d Cir. 2000).

(1976); Rouse v. Plantier, 182 F.3d 192 (3d Cir. 1999).  In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must demonstrate: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need.  Estelle, 492 U.S. at 106; Natale, 318 F.3d at 582.

To satisfy the first prong of the Estelle inquiry, the inmate must demonstrate that his medical needs are serious.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Hudson v. McMillian, 503 U.S. 1, 9 (1992).  A serious medical need has been defined by the Third Circuit as (1) "one that has been diagnosed by a physician as requiring treatment;" (2) "one that is so obvious that a lay person would recognize the necessity for a doctor's attention;" or (3) one for which "the denial of treatment would result in the unnecessary and wanton infliction of pain" or "a life-long handicap or permanent loss." Atkinson v. Taylor, 316 F.3d 257, 272-273 (3d Cir. 2003) (internal quotations and citations omitted); see also Lanzaro, 834 F.2d at 347.  Here, Plaintiff's missing ear here is clearly a serious need, that if untreated would have resulted in a permanent physical loss.  In addition, Plaintiff had been diagnosed by Dr. Busch as requiring reconstructive surgery.

The second element of the Estelle test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need.  "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm.  Farmer v. Brennan, 511 U.S. 825, 837-38 (1994).  A prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. Andrews v. Camden County, 95 F.Supp.2d 217, 228 (D.N.J. 2000).  Similarly, "mere disagreements over

9

medical judgment do not state Eighth Amendment claims." White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). Deliberate indifference has been established where prison officials: (1) know of a prisoner's need for medical treatment but intentionally refuse to provide it; (2) delay medical treatment for non-medical reasons; or (3) prevent a prisoner from receiving needed or recommended treatment. See Rouse, 182 F.3d at 197.

Here, Plaintiff has not demonstrated deliberate indifference. Plaintiff was taken to the hospital immediately after the incident, where he had his ear stitched up; he was taken to Dr. Busch for an evaluation several days later, and then again to have his stitches removed. Plaintiff has had three reconstructive surgeries and continuous treatment since the injury, and receives daily treatments for his ears to prevent infection. Although Plaintiff argues that his surgery was unreasonably delayed, he has failed to demonstrate that the surgery needed to be done sooner or that he suffered unnecessary pain because of it. Plaintiff admits that no doctor associated with his surgery told him that having the surgery a year after the injury had any effect on the severity of his current pain. Def. Exh. 4 at 78:20-80:20. Plaintiff's disagreement with prison medical authorities about the timing of his surgery does not indicate that CCDC knew of a need for earlier surgery and refused to provide it.[5] The Court therefore grants summary judgment to Defendants based on Plaintiff's claim of inadequate medical care.

---

[5]The Court notes that Plaintiff has not asserted liability against any of the Corrections Officers for inadequate medical care, and thus construes this claim solely against CCDC. To the extent that Plaintiff is attempting to argue that the individual Officers are liable for failing to allow Plaintiff to search for his ear, thereby aggravating his injuries, Plaintiff fails to demonstrate that prison officials were indifferent to his medical needs. Immediately after Plaintiff was escorted to the medical department, the area was throughly searched by two investigators from the Internal Affairs department and Officer Rolon, and Sergeant Kenneth Cunningham. Cert. of Sergeant Kenneth Cunningham at ¶¶ 2-13.

Plaintiff also has argued that he suffered emotional injuries because he was subjected to humiliation by the other inmates because he was missing an ear for a year while awaiting his first reconstructive surgery. In a § 1983 action, damages "may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment to reputation..., personal humiliation, and mental anguish and suffering.'" Allah v. Al-Hafeez, 226 F.3d 247, 250 (3d Cir. 2000) (quoting Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 307 (1986)). However, damages may only be awarded to compensate for actual injury suffered as the result of the violation of a constitutional right. Id. Thus, because Plaintiff has not demonstrated that CCDC was deliberately indifferent to his medical needs as a result of the delay in surgery, he is unable to recover damages based upon "emotional distress" resulting from that delay.

      2.    Failure to Protect

Plaintiff also alleges that Defendants failed to protect him from attacks from other prisoners. Because Plaintiff was a pretrial detainee at the time of the incident, his claims are analyzed under the Due Process Clause of the Fourteenth Amendment under the standard set forth in Bell v. Wolfish, 441 U.S. 520 (1979): whether pretrial detainees are adequately protected from "punishment," as opposed to protection from punishment that is "cruel and unusual " under the Eighth Amendment. Hubbard, 399 F.3d at 166. Again, however, as a practical matter, courts have analyzed claims of failure to protect under the "deliberate indifference" standard set forth in Eighth Amendment jurisprudence, as the due process rights of a pretrial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. See, e.g., Turner v. Cupp, 238 F.3d 424, 2000 WL 1141423, at *2 (6th Cir. Aug. 4, 2000) (unpublished decision); Lopez v. LeMaster, 172 F.3d 756, 759 n. 2 (10th Cir. 1999); Doe v. Washington County, 150 F.3d 920, 922

(8th Cir. 1998); Ervin v. Mangum, 127 F.3d 1099, 1997 WL 664606, at *4 (4th Cir. Oct. 27, 1997) (unpublished decision).

Under the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, including personal safety. Farmer v. Brennan, 511 U.S. 825, 832 (1994). Prison officials must take reasonable measures "to protect prisoners from violence at the hands of other prisoners." Id. at 833 (internal quotations omitted). "Being violently assaulted in prison is simply 'not a part of the penalty that criminal offenders pay for their offenses against society.'" Id. at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Negligence, or a lack of due care under the circumstances, is insufficient to support a claim that Defendants failed to protect Plaintiff. Davidson v. Cannon, 474 U.S. 344, 347 (1986). Plaintiff must show that he is "incarcerated under conditions posing a substantial risk of harm," and that prison officials knew of and disregarded "an excessive risk to inmate health or safety." Farmer, 511 U.S. at 833, 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official or jailor, when faced with the knowledge of a substantial risk of serious harm to a prisoner, must take "reasonable measures to abate it" or his inaction will constitute deliberate indifference to that risk. Farmer, 511 U.S. at 847.

Plaintiff's failure to protect claim is based upon allegations that (1) the overcrowded conditions at CCCF increased the risk of altercations between the prisoners; (2) that he is a sex offender who should not have been placed in the general prison population; and (3) that despite Plaintiff's calls for help in an area staffed by four corrections officers, none of them came to his immediate assistance.

12

Plaintiff has failed to present any evidence that overcrowded conditions posed a substantial risk of harm to the prisoners, simply stating that his deposition that "it's just [his] belief." Def. Exh. 4 at 97:5-8. With respect to his allegation that he was a sex offender who should not have been placed in the general prison population, Plaintiff has failed to demonstrate that prison officials knew that this placed him at substantial risk of serious harm. To the contrary, Plaintiff said that prior to the assault, he and Thornton "got along pretty good. I was trying to help him learn to read," and that he "got along... fine" with his other cellmate, Figueroa." Def. Exh. 4 at 20:1-5. Prior to April 2, nothing happened between Plaintiff and Thornton, or between Plaintiff and Figueroa to make him concerned about his safety. Id. at 20:6-21:18.

Plaintiff also fails to demonstrate that the guards were aware of the incident with Thornton and failed to protect him by coming to his assistance any sooner than they did. Plaintiff did not alert them to the dispute between him and Thornton during the period in which they were each adjusting the volume on the television. Def. Exh. 4 at 88:2-14; 90:2-24. Officers were first alerted to the dispute when Plaintiff screamed in pain as Thornton bit off his ear, and when other inmates began beating on the doors to get their attention immediately thereafter. Id. at 38:15-25; 39:5-11. Plaintiff estimates that two minutes passed from the bite to when Officer Rolon entered the cell. Id. at 39:12-23. In the absence of any other evidence, a two minute delay in response does not support Plaintiff's claim that the guards were aware of a substantial risk and failed to respond. The Court therefore finds that Plaintiff has failed to create a genuine issue of material fact that Defendants failed to protect him from harm, and grants summary judgment to Defendants.

13

### III.     CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.  An appropriate order will follow.

/s/ Freda L. Wolfson
Honorable Freda L. Wolfson
United States District Judge
